**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IAN DiFALCO, derivatively on behalf of HEALTH INSURANCE INNOVATIONS, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>GAVIN T. SOUTHWELL, MICHAEL W. KOSLOSKE, MICHAEL D. HERSHBERGER, PAUL E. AVERY, ANTHONY J. BARKETT, PAUL GABOS, ROBERT MURLEY, BRUCE TELKAMP, and SHELDON WANG,<br><br>        Defendants,<br><br>and<br><br>HEALTH INSURANCE INNOVATIONS, INC.,<br><br>        Nominal Defendant. | C.A. No. _____<br><br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Ian DiFalco ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Health Insurance Innovations, Inc. ("HIIQ" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Gavin T. Southwell, Michael W. Kosloske, Michael D. Hershberger, Paul E. Avery, Anthony J. Barkett, Paul Gabos, Robert Murley, Bruce Telkamp, and Sheldon Wang (collectively, the "Individual Defendants," and together with HIIQ, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of HIIQ, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934

(the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and him own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding HIIQ, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by HIIQ's directors and officers from November 3, 2016 through the present (the "Relevant Period").

2.      HIIQ was founded in 2008 and is based in Florida. HIIQ develops, distributes and administers short-term medical plans, hospital indemnity plans, and "supplementary products," which the Company describes as including pharmacy benefit cards, dental plans, vision plans, and life insurance policies. HIIQ's target market is the large segment of U.S. consumers who are uninsured or underinsured.

3.      The Company markets its products through both an "internal distribution network" and an "external distribution network consisting of independently owned and operated" call centers.

4.      A third-party administrator ("TPA") is an entity responsible for processing claims or other aspects of employee benefit plans for a separate entity. In the insurance context, TPAs provide other services such as underwriting and customer service.

5.      In Florida, in order for an entity to function as a TPA, it must first file an application for a TPA license with the Florida Office of Insurance Regulation ("FLOIR") (a "TPA Application"). HIIQ first filed a TPA Application on July 18, 2016.

6.      The TPA Application process was anything but smooth for HIIQ. On or before July 25, 2017, the FLOIR "deemed that application incomplete and returned it."

7.      The Company reapplied for its Florida TPA license on October 28, 2016. One month later, on November 28, 2016, the FLOIR issued the Company a letter seeking additional material omitted from the TPA Application and establishing a response date of December 5, 2016. The Company requested an extension to December 12, 2016, which was granted. However, HIIQ did not file its response by December 12, 2016.

8.      The Company sent the FLOIR a letter on December 16, 2016, admitting its failure to timely respond and requesting "an unspecified extension of time to gather the remaining information." Prior to receiving a response from the FLOIR, the Company withdrew its TPA Application.

9.      FLOIR sent a letter dated December 16, 2016 that advised the Company that "until your application has been approved by the office and the appropriate licensure issued, the referenced company should not transact business that requires such license in this state." This material development was not disclosed to the market by HIIQ, in its SEC filings or otherwise.

10.     The TPA Application was ultimately refiled on April 19, 2017. The Company's application was ultimately denied on June 1, 2017, with the FLOIR concluding, *inter alia*, that the application "contained numerous, material errors and omissions," and that HIIQ was "not competent."

11.     The Company responded to the FLOIR's June 1, 2017 letter by a letter dated June 16, 2017. In that letter, HIIQ erroneously characterized the June 1, 2017 letter as a "notice proposing to deny" the application. Further, HIIQ's letter decried the effect of a denial on its licensing in other states, asserting that it would create a "domino effect" whereby HIIQ might lose its licenses in other states. Such an assertion demonstrates that the Company was aware that the denial of its Florida TPA Application was a profoundly negative material development. The contents of the June 16, 2017 letter were not disclosed to the investing public until they were published in an online news article on September 11, 2017.

12.     The FLOIR's denial was not disclosed to the investing public until months later when the Company acknowledged it in its Form 10-Q filed with the SEC on August 4, 2017. However, this disclosure was also materially misleading in that it failed to reveal the highly negative potential consequences that the Individual Defendants were aware such denial could have on HIIQ's operations

13.     Concurrent with, and prior to, the Company's filing of its Florida TPA application, HIIQ faced regulatory scrutiny from a number of states related to its core business operations outside of Florida. This scrutiny largely stems from the Company's use of third-party call centers, which consumers and regulators have alleged to have made false and misleading statements to consumers in connection with the sale of insurance and engaged in the sale of insurance without possessing the appropriate license.

14.     The Company admitted in SEC filings during the Relevant Period that "[t]he Indiana Department of Insurance is serving as the managing participant of the multistate examination, and the examination includes, among other things, a review of whether [ ] the Company has engaged in any unfair or deceptive acts or non-compliant insurance business

practices." The Company's Form 10-K filed with the SEC on March 1, 2018 indicated that the multistate examination included forty-three states.

15.     The Arkansas Insurance Department issued a press release on March 28, 2016 announcing that it had issued a Cease and Desist Order against HIIQ, which required the Company "and its affiliates to immediately stop the sale, solicitation, or advertising of any health plans or medical insurance using unlicensed agents, and stop intentionally misrepresenting the terms of an insurance contract or application for insurance." The press release reported that the Cease and Desist Order was issued "over allegations the company has used fraudulent and dishonest practices in attempting to sell short-term health care plans."

16.     On May 9, 2016, the office of the Montana State Auditor, Commissioner of Securities & Insurance filed an action against HIIQ for "routinely" selling insurance policies "through misinformation and deception," characterizing HIIQ's actions as a "scheme" to defraud Montana residents. As a result, the Company's Montana license has been suspended since the state entered a Cease and Desist Order on May 9, 2016.

17.     The regulatory actions taken by various states were disclosed at the very end of a lengthy press release attached to a Form 8-K filed with the SEC on July 20, 2016. The press release assured investors that Defendant "Southwell, with his strong skills and experience with insurance regulatory matters, will lead the Company's efforts in responding to and addressing any such regulatory matters."

18.     Beginning on November 10, 2016, several of the Individual Defendants began making significant sales of Company stock. Defendant Hershberger, for example, liquidated approximately 20% of his Company stock between November 17 and November 21, 2016. Defendant Kosloske sold 3,000,000 shares of HIIQ stock he beneficially owned on March 13,

2017, pursuant to a secondary public offering in which he (and entities he controls) was the sole selling participant.

19.     On September 1, 2017, Defendants Southwell and Hershberger, under penalty of perjury, personally executed a "Declaration and Certification" with the Illinois Department of Insurance asserting that the Company had never been "refused" a TPA license, and that a "license to act as such" had never been denied "in any state." However, Defendants Southwell and Hershberger had each recently signed a Form 10-Q filed with the SEC on August 4, 2017, in which the Company had disclosed the FLOIR's denial of the Company's TPA application.

20.     On September 11, 2017, a whistleblower report titled "Short $HIIQ: Fraud Penalties to Exceed $100 Million and Undisclosed 'Domino Effect'" (the "Pearson Exposé"),[1] revealed that Defendants had made material misstatements and omissions regarding the risks flowing from the Florida TPA Application process and ultimate denial.

21.     In response to the Pearson Exposé, the Company's share price dropped nearly 22%, or $6.55, over the course of the trading day, closing at $23.35 on September 11, 2017.

22.     The price of the Company's shares continued to drop the following day, losing 15% of their value, or $3.60, and closing at $19.75 on September 12, 2017.

23.     During the Relevant Period, the Company: (1) made false and misleading statements in licensing applications and renewals submitted to, and communications with, state regulatory bodies; and (2) violated Florida regulations and laws by conducting business as an insurance administrator in the State of Florida prior to submitting an application for licensure as a TPA (collectively, the "Regulatory Misconduct").

---

[1]Available at: https://moxreports.com/hiiq/.

24.     Further, during the Relevant Period, the Company: (1) made, or caused third parties to make, false and misleading statements to consumers in connection with the sale of insurance; and (2) used third party call centers to sell insurance that were not properly licensed to do so (collectively, the "Sales Misconduct").

25.     In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Regulatory Misconduct and Sales Misconduct and to fail to maintain adequate internal controls.

26.     Also during the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and/or misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact to the investing public that failed to disclose, *inter alia*, that: (1) the Company's TPA Application with the FLOIR was unsuccessful as a result of, *inter alia*, the agency's discovery of undisclosed legal actions against HIIQ insiders; (2) the Company was omitting material information from the FLOIR and disregarding the FLOIR's instructions in completing the TPA Application; (3) the Company privately warned the FLOIR of the anticipated "domino effect" of the FLOIR's denial, by which the Company would subsequently either lose or be denied licenses in other states; (4) the TPA license denial was substantially harming the Company's ability to conduct its core business operations; (5) the Company had been accused of fraud by insurance regulators in Montana, and had suffered negative regulatory actions there as a result of the Company's misconduct; (6) the Company engaged in the Regulatory Misconduct and Sales

Misconduct; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

27.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and/or misleading statements and/or omissions of material fact to the investing public.

28.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while five of them engaged in insider sales, netting proceeds of over $50.7 million. Over 11,627 shares of the Company's common stock were repurchased during March 2017 for almost $185,000. As the Company stock was actually only worth $14.10 per share, the price at which it was trading on September 28, 2017, the Company overpaid approximately $20,463 in total.

29.     In light of the Individual Defendants' misconduct, which has subjected HIIQ, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and Chief of Product Innovation to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Florida (the "Securities Class Action") and the Company to being named as a defendant in consumer class action lawsuits pending in the United States District Court for the Southern District of Indiana, the United States District Court for the District of Montana, and the Superior Court for the State of Arizona in the County of Maricopa (the "Consumer Class Actions"), the need to undertake internal investigations, the Company's being the subject of outside investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-

compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

30.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CFO's and the Chief of Product Innovation's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the HIIQ Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

32.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

33.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

34.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District,

or he is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over him.

35.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

36.     Venue is proper in this District because HIIQ and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

37.     Plaintiff is a current shareholder of HIIQ common stock. Plaintiff has continuously held HIIQ common stock at all relevant times.

### Nominal Defendant HIIQ

38.     HIIQ is a Delaware corporation with its principal executive offices at 15438 N. Florida Avenue, Suite 201, Tampa, FL 33613. HIIQ's shares trade on the NASDAQ under the ticker symbol "HIIQ."

### Defendant Southwell

39.     Defendant Gavin T. Southwell ("Southwell") has served as the Company's President since July 2016, and as its CEO and member of the Board since November 2016. According to the 2017 Proxy Statement, as of April 7, 2017, Defendant Southwell beneficially owned 277,777 shares of the Company's common stock, which represented 1.5% of the Company's outstanding stock on that date.[2] Given that the price per share of the Company's

---

[2] This figure includes awards of 217,777 restricted shares that had not yet vested as of April 7, 2017.

common stock at the close of trading on April 7, 2017 was $16.45, Southwell owned approximately $4.6 million worth of HIIQ stock.

40.     For the fiscal year ended December 31, 2015, Defendant Southwell received $3,719,222 in compensation from the Company. This included $181,752 in salary, $584,994 in bonus, $2,165,950 in stock awards, $684,720 in option awards, and $101,806 in all other compensation.

41.     The Company's 2016 Proxy Statement stated the following about Defendant Southwell:

> **Gavin Southwell** (age 39). Gavin D. Southwell has served as our Chief Executive Officer since November 2016 and served as our President since July 2016. Previously, from May 2009 to January 2016, Mr. Southwell was Chief Operations Officer at Cooper Gay Swett & Crawford (CGSC), one of the world's largest independent global wholesale and reinsurance broking groups, with a network of over sixty offices across the Americas, Europe, and Asia, employing over 1,800 skilled professionals. In this capacity, Mr. Southwell was responsible for CGSC's operations and technology and for establishing the commercial strategy for each region, the set-up of new offices and integration of acquired businesses, and the design and implementation of a target operating model by business type. Prior to joining CGSC, Mr. Southwell served, from October 2007 to April 2009, as the Risk Manager of Beazley plc, one of the largest Lloyd's insurers and the parent company of Beazley Insurance Company Inc., an A.M. Best A-rated carrier licensed in all 50 states. Beazley is a market leader globally in professional lines, accident and health, property, marine, reinsurance and contingency business. During his time at Beazley, Mr. Southwell was responsible for risk management, preparation for the new capital requirements under Solvency II, and leading the internal management committee responsible for delegated underwriting. Mr. Southwell's detailed knowledge and extensive insurance background, including having worked in senior executive positions for a broker, MGU, insurer and reinsurer, and his proven track record of delivering enhanced performance with a customer focused approach makes him a valuable member of the Board.

**Defendant Kosloske**

42.     Defendant Michael W. Kosloske ("Kosloske") founded the Company. He serves as the Company's Chief of Product Innovation and as a Company director and was Board Chair from 2012 to 2016. According to the Company's Schedule 14A filed with the SEC on April 20, 2017

(the "2017 Proxy Statement), as of April 7, 2017, Defendant Kosloske beneficially owned 3,875,029 shares of the Company's Class A common stock, which represented 24.7% of the Company's outstanding Class A stock as of that date, and 3,841,667 shares of the Company's Class B stock, representing 100% of the Company's outstanding Class B stock.[3] Given that the price per share of the Company's common stock at the close of trading on April 7, 2017 was $16.45, Kosloske owned approximately $126.9 million worth of HIIQ stock.[4]

43.    For the fiscal year ended December 31, 2016, Defendant Kosloske received $1,616,890 in compensation from the Company. This included $530,000 in salary, $477,000 in bonus, and $609,890 in option awards.

44.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kosloske sold 3 million shares of Company stock held by a Company subsidiary he fully controlled

---

[3] The shares of Defendant Kosloske include 100 shares of Class A common stock granted under the LTIP. Defendant Kosloske's shares also consist of 3,802,451 shares of Class B common stock held of record by Health Plan Intermediaries, LLC ("*HPI*") and 39,216 shares of Class B common stock held by Health Plan Intermediaries Sub, LLC ("*HPIS*"). Defendant Kosloske is the primary manager of HPI, and has sole voting and dispositive power over the shares held by HPI. HPI is the sole managing member of HPIS and has sole voting and dispositive power over the shares held by HPIS. Defendant Kosloske, by virtue of his control of HPI and HPI's control of HPIS, is deemed to beneficially own all the shares of Class B common stock held of record by each of HPI and HPIS. The shares of Class B common stock, together with the Series B Membership Interests of Health Plan Intermediaries Holdings, LLC, an operating subsidiary, are exchangeable, at Defendant Kosloske's election, for equal number of shares of Class A common stock. This exchange right is currently effective and has no expiration date. The shares of Defendant Kosloske also include 7,203 shares owned by Defendant Kosloske's wife, Lori Kosloske and 26,079 shares owned by Michael W. Kosloske 2012 Descendants Trust Agreement dated December 7, 2012, Lori Kosloske as Directing Trustee.
[4] Although there is not a developed market for the Company's Class B common stock, Class B common stock may, when combined with an equivalent number of Series B. Membership interests in HIPH, be exchanged for shares of Class A common stock. Therefore, for the purposes of calculating the value of Defendant Kosloske's shares, Class B shares are assumed to be of equivalent value to Class A shares.

(Health Plan Intermediaries Sub, LLC ("HPIS")) in a secondary public offering on March 13, 2017, from which he benefited in the amount of approximately $39.5 million. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

45.     The Company's 2017 Proxy Statement stated the following about Defendant Kosloske:

> **Michael W. Kosloske**[5] (age 53). Michael W. Kosloske, our founder, currently serves as Chief of Product Innovation and as a member of the Board of Directors. Previously, Mr. Kosloske served as our President and Chief Executive Officer since we began operations in 2008 until 2015 and as our Chairman from 2012 to 2016. Prior to founding our Company, from 1987 to 2007, Mr. Kosloske was President of Health Plan Administrators, Inc. (HPA), a fully-insured niche and individual health insurance company that focused on online sales. In 2005, Mr. Kosloske sold HPA to Independence Holding Company, a New York Stock Exchange-listed holding company engaged in the life and health insurance business, and he remained president of HPA until 2007. Previously, from 1986 to 1987, Mr. Kosloske was marketing manager for Dun & Bradstreet Plan Services, Inc., a third-party administrator in Tampa, Florida. Mr. Kosloske holds a Bachelor of Science degree in risk management and insurance from Florida State University. Mr. Kosloske is married to our Chief Broker Compliance Officer, Lori Kosloske. Mr. Kosloske provides our Board with an intimate knowledge of our operations as well as industry knowledge from his considerable experience in the insurance industry.

**Defendant Hershberger**

46.     Defendant David Hershberger ("Hershberger") has served as the Company's CFO since September 2016. According to the 2017 Proxy Statement, as of April 7, 2017, Defendant Hershberger beneficially owned 118,369 shares of the Company's common stock.[6] Given that the price per share of the Company's common stock at the close of trading on April 7, 2017 was $16.45, Hershberger owned over $1.9 million worth of HIIQ stock.

---

[5] Emphasis in original unless otherwise noted throughout this Complaint.
[6] This figure includes awards of 79,935 restricted shares that had not yet vested as of April 7, 2017.

47.     For the fiscal year ended December 31, 2015, Defendant Hershberger received $893,684 in compensation from the Company. This included $317,692 in salary, $112,500 in bonus, $347,700 in stock awards, and $115,793 in option awards.[7]

48.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hershberger made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| September 1, 2017 | 15,269 | $31.07 | $474,346 |
| August 31, 2017 | 2,500 | $34.81 | $87,017 |
| August 1, 2017 | 5,000 | $27.65 | $138,265 |
| July 3, 2017 | 5,000 | $23.22 | $116,550 |
| June 1, 2017 | 5,000 | $22.39 | $111,975 |
| May 9, 2017 | 15,000 | $20.37 | $305,580 |
| May 1, 2017 | 5,000 | $16.79 | $83,965 |
| April 3, 2017 | 5,000 | $15.95 | $79,725 |
| March 1, 2017 | 5,000 | $17.90 | $89,510 |
| February 13, 2017 | 10,000 | $18.35 | $183,540 |
| November 21, 2016 | 7,000 | $10.58 | $74,039 |
| November 18, 2016 | 20,000 | $9.99 | $199,840 |
| November 17, 2016 | 31,720 | $10.27 | $325,827 |

Thus, in total, before the fraud was exposed, he sold 112,269 Company shares on inside information, for which he received approximately $2.1 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

49.     The Company's 2017 Proxy Statement stated the following about Defendant Hershberger:

---

[7] The 2017 Proxy Statement does not report Defendant Hershberger's income, and therefore these figures are drawn from the Company's Schedule 14A filed with the SEC on April 28, 2016.

**Michael D. Hershberger** (age 54). Michael D. Hershberger was appointed as our Chief Financial Officer on September 16, 2015. Prior to that he served as interim Chief Financial Officer since March 30, 2015 and our Senior Vice President of Finance and Business Development since November 2013. He served as our Chief Financial Officer from February 2012 through November 2013, and served as our interim Chief Financial Officer from July 31, 2014 until September 2, 2014. Mr. Hershberger served as senior manager at Baker Tilly, a full service accounting and advisory firm, from 2005 to 2011, where he was responsible for managing housing research from 2005 until joining us in 2011. Mr. Hershberger holds a bachelor of science degree in accounting from Augustana College and earned his masters of science degree in urban land economics/finance from the University of Wisconsin Graduate School of Business. He is a Certified Public Accountant in the State of Illinois.

### Defendant Wang

50.     Defendant Dr. Sheldon Wang ("Wang") has served as the Company's Chief Technology Officer since 2014, and as a director since May 2017.[8] According to the 2017 Proxy Statement, as of April 7, 2017, Defendant Wang beneficially owned 246,001 shares of the Company's common stock, representing 1.6% of all outstanding shares. Given that the price per share of the Company's common stock at the close of trading on April 7, 2017 was $16.45, Wang owned over $4 million worth of HIIQ stock.

51.     For the fiscal year ended December 31, 2016, Defendant Wang received $909,230 in compensation from the Company. This included $350,000 in salary, $210,000 in bonus, and $349,230 in option awards.

---

[8] The 2017 Proxy Statement notes that:
> Pursuant to the Agreement and Plan of Merger (the "HealthPocket Merger Agreement") dated July 14, 2014 between the Company, HealthPocket, Inc. Bruce A. Telkamp, Dr. Sheldon Wang, and certain other parties, the Board is required to nominate and recommend either Bruce A. Telkamp or Dr. Wang to the Board, which nomination and recommendation is required to rotate annually.

52.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Wang made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 7, 2017 | 4,530 | $32.95 | $149,272 |
| September 6, 2017 | 12,106 | $31.95 | $386,786 |
| September 5, 2017 | 4,201 | $30.95 | $130,020 |
| July 13, 2017 | 4,750 | $25.80 | $122,550 |
| June 19, 2017 | 10,000 | $24.95 | $249,500 |
| June 14, 2017 | 16,421 | $21.79 | $357,879 |
| June 12, 2017 | 5,149 | $21.60 | $111,218 |
| May 19, 2017 | 5,864 | $21.20 | $124,316 |
| May 18, 2017 | 12,019 | $20.72 | $249,033 |
| May 17, 2017 | 4,115 | $20.64 | $84,933 |
| May 12, 2017 | 8,616 | $21.41 | $184,549 |
| May 11, 2017 | 3,801 | $20.65 | $78,490 |
| May 5, 2017 | 4,750 | $20.80 | $98,800 |
| May 4, 2017 | 20,000 | $19.60 | $392,000 |
| March 16, 2017 | 2,000 | $16.90 | $33,800 |
| March 15, 2017 | 3,002 | $16.95 | $50,883 |
| March 14, 2017 | 3,526 | $16.75 | $59,060 |
| March 13, 2017 | 1,032 | $16.35 | $16,873 |
| December 8, 2016 | 5,000 | $14.65 | $73,250 |
| December 7, 2016 | 5,000 | $14.10 | $70,500 |
| December 6, 2016 | 5,000 | $13.45 | $67,250 |
| November 28, 2016 | 10,000 | $12.40 | $124,000 |
| November 10, 2016 | 5,000 | $6.90 | $34,500 |

Thus, in total, before the fraud was exposed, he sold 155,882 Company shares on inside information, for which he received over $3.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

53.    The Company's 2016 Proxy Statement stated the following about Defendant Wang:

**Dr. Sheldon Wang** (age 57). Dr. Wang has served as our Chief Technology Officer since July 2014. Prior to joining HII and co-founding HealthPocket, Inc., Dr. Wang was a senior executive at eHealth, Inc.[ ](NASDAQ: EHTH) for 12 years, where

he oversaw all technology functions. Prior to his time at eHealth, Dr. Wang held executive technology positions with Eclipsys Corporation and Ameritech Health Connections. Dr. Wang received a Bachelor of Science in physics from the Fuzhou University of China, a Master of Science in physics from Idaho State University and a Ph.D. in medical informatics from the University of Utah. Dr. Wang's experience and background in working with leading-edge technology companies in the health and health IT sectors make him a valuable resource for the Board.

**Defendant Telkamp**

54.     Defendant Bruce Telkamp ("Telkamp") has served as CEO of HIIQ's Consumer Division and CEO of HealthPocket, Inc., a HIIQ subsidiary, since May 2015. He also served as a Company director from April 2016 to May 2017.[9] According to the 2017 Proxy Statement, as of April 7, 2017, Defendant Telkamp beneficially owned 131,001 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 7, 2017 was $16.45, Telkamp owned approximately $2.2 million worth of HIIQ stock.

55.     For the fiscal year ended December 31, 2016, Defendant Telkamp received $909,230 in compensation from the Company. This included $350,000 in salary, $210,000 in bonus, and $349,230 in option awards.

56.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Telkamp made the following sales of company stock, and made no purchases of Company stock:

---

[9] The 2017 Proxy Statement notes that:
> Pursuant to the Agreement and Plan of Merger (the "HealthPocket Merger Agreement") dated July 14, 2014 between the Company, HealthPocket, Inc. Bruce A. Telkamp, Dr. Sheldon Wang, and certain other parties, the Board is required to nominate and recommend either Bruce A. Telkamp or Dr. Wang to the Board, which nomination and recommendation is required to rotate annually.

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 1, 2017 | 9,970 | $36.19 | $360,804 |
| August 7, 2017 | 11,501 | $31.45 | $361,671 |
| August 2, 2017 | 15,000 | $26.58 | $398,700 |
| July 31, 2017 | 15,000 | $28.02 | $420,255 |
| July 26, 2017 | 15,000 | $28.83 | $432,450 |
| July 24, 2017 | 15,000 | $27.76 | $416,400 |
| July 18, 2017 | 15,000 | $26.86 | $402,900 |
| July 17, 2017 | 15,000 | $26.50 | $397,500 |
| June 1, 2017 | 8,014 | $22.60 | $181,116 |
| May 26, 2017 | 3,901 | $22.60 | $88,162 |
| May 15, 2017 | 2,093 | $22.60 | $47,301 |
| May 12, 2017 | 14,907 | $22.27 | $331,978 |
| May 11, 2017 | 3,838 | $20.65 | $79,254 |
| May 10, 2017 | 4,900 | $20.65 | $101,189 |
| May 9, 2017 | 19,279 | $20.15 | $388,452 |
| April 24, 2017 | 4,750 | $15.80 | $75,045 |
| April 19, 2017 | 5,000 | $15.42 | $77,120 |
| April 17, 2017 | 9,750 | $15.10 | $147,225 |
| April 12, 2017 | 5,000 | $16.33 | $81,660 |
| April 10, 2017 | 5,000 | $16.41 | $82,030 |
| March 16, 2017 | 4,187 | $16.82 | $70,408 |
| March 15, 2017 | 9,229 | $16.83 | $155,360 |
| November 29, 2016 | 3,456 | $12.85 | $44,409 |
| November 21, 2016 | 390 | $10.56 | $4,118 |
| November 18, 2016 | 26,890 | $10.00 | $268,900 |
| November 17, 2016 | 31,720 | $10.27 | $325,827 |

Thus, in total, before the fraud was exposed, he sold 273,775 Company shares on inside information, for which he received over $5.7 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

57.     The Company's 2017 Proxy Statement stated the following about Defendant Telkamp:

**Bruce A. Telkamp** (age 49). Bruce A. Telkamp last served as a director from July 14, 2014 through May 19, 2015. Mr. Telkamp has served as the Chief Executive Officer of the Company's Consumer Division and as Chief Executive Officer of

HealthPocket, Inc. a subsidiary of the Company, since May 2015. Prior to that, Mr. Telkamp served as the Company's Chief Operating Officer and Chief Executive Officer of HealthPocket from July 2014. Prior to joining HII, Mr. Telkamp co-founded HealthPocket, Inc. and was HealthPocket's Chief Executive Officer. Prior to co-founding HealthPocket, Mr. Telkamp was a senior executive officer at eHealth, Inc. for 12 years, where Mr. Telkamp oversaw all business, marketing and legal/regulatory functions for eHealth. Before that Mr. Telkamp was a senior executive with MetaCreations, Inc. and an attorney with Wilson Sonsini Goodrich & Rosati. Mr. Telkamp has a J.D. from the University of California, Hastings and a B.A in from the University of California, Los Angeles. Mr. Telkamp's experience and background leading technology companies in healthcare and insurance sectors make him a valuable resource for the Board.

**Defendant Avery**

58.     Defendant Paul E. Avery ("Avery") has served as a Company director since 2013. According to the 2017 Proxy Statement, as of April 7, 2017, Defendant Avery beneficially owned 20,720 shares of the Company's common stock.[10] Given that the price per share of the Company's common stock at the close of trading on April 7, 2017 was $16.45, Avery owned approximately $340,844 worth of HIIQ stock.

59.     For the fiscal year ended December 31, 2016, Defendant Avery received $79,500 in compensation from the Company, comprised of $34,500 in fees paid or earned in cash, and $45,000 in stock awards.

60.     The Company's 2017 Proxy Statement stated the following about Defendant Avery:

**Paul E. Avery** (age 57). Paul E. Avery has served as a director since February 2013. Since January 2013, Mr. Avery has been President and Chief Executive Officer of World of Beer Franchising, Inc. Previously, Mr. Avery served as Chief Operating Officer of OSI Restaurant Partners, Inc. from May 2005 until his retirement in July 2009, where he oversaw operation of Outback Steakhouse, Carrabba's Italian Grill, Bonefish Grill, Cheeseburger in Paradise, Lee Roy Selmon's, Ala Carte Pavilion and Outback International. He was promoted to Chief Operating Officer of Outback Steakhouse, Inc. in January 2004 and served as President of Outback Steakhouse, Inc. starting in April 1997. Mr. Avery was

[10] This figure includes awards of 15,700 restricted shares that had not yet vested as of April 7, 2017.

elected to the company's board of directors in 1998 and served until April 2004. He has an Associate Degree in Hotel and Restaurant Management from Middlesex County College and a Bachelor of Science Degree from Kean University, both in New Jersey. Mr. Avery currently serves on the board of directors for Suntrust Bank – Tampa Bay and The Friedreich's Ataxia Research Alliance. He is a Trustee for Paul Smith's College NY. Mr. Avery provides our Board with insights from his management of large-scale operations as well as an understanding of financial statements.

## Defendant Barkett

61.     Defendant Anthony J. Barkett ("Barkett") has served as a Company director since 2013 and is a member of the Audit Committee. According to the 2017 Proxy Statement, as of April 7, 2017, Defendant Barkett beneficially owned 16,700 shares of the Company's common stock.[11] Given that the price per share of the Company's common stock at the close of trading on April 7, 2017 was $16.45, Barkett owned approximately $274,715 worth of HIIQ stock.

62.     For the fiscal year ended December 31, 2016, Defendant Barkett received $93,000 in compensation from the Company, comprised of $48,000 in fees paid or earned in cash, and $45,000 in stock awards.

63.     The Company's 2017 Proxy Statement stated the following about Defendant Barkett:

**Anthony J. Barkett** (age 70). Anthony J. Barkett has served as a director since March 2013. Mr. Barkett currently serves as Vice-President at Amalie Oil Co., an oil company that develops high-quality petroleum products, a position he has held since 1977. At Amalie Oil, Mr. Barkett is responsible for overseeing and coordinating activities in accounting, marketing, sales, operations, information technology and administration. He is also responsible for developing and approving internal controls. From 2007 to 2012, Mr. Barkett was a board member of the Florida Hospital Foundation and he is currently a committee member at The Friedreich's Ataxia Research Alliance. Mr. Barkett brings to our Board his knowledge of internal controls over financial reporting, an understanding of financial statements and experience with diverse aspects of business operations.

---

[11] This figure includes awards of 15,700 restricted shares that had not yet vested as of April 7, 2017.

**Defendant Gabos**

64.     Defendant Paul Gabos ("Gabos") has served as a Company director since 2013, Chairman on the Board since November 2016, and Chairs the Audit Committee. According to the 2017 Proxy Statement, as of April 7, 2017, Defendant Gabos beneficially owned 40,700 shares of the Company's common stock.[12] Given that the price per share of the Company's common stock at the close of trading on April 7, 2017 was $16.45, Gabos owned approximately $669,515 worth of HIIQ stock.

65.     For the fiscal year ended December 31, 2016, Defendant Gabos received $109,500 in compensation from the Company, comprised of $64,500 in fees paid or earned in cash, and $45,000 in stock awards.

66.     The Company's 2017 Proxy Statement stated the following about Defendant Gabos:

> **Paul G. Gabos** (age 52). Paul G. Gabos has served as a director since August 2013 and was appointed as Chairman of the Board in November 2016. Mr. Gabos was the Chief Financial Officer from June 1997 until December 2012 of Lincare Holdings Inc., a home healthcare services company that was NASDAQ-listed until its acquisition in August 2012. Prior to his service as Chief Financial Officer, Mr. Gabos was employed by Lincare in positions of increasing responsibility for an additional five years. Since 2002, Mr. Gabos has been a member of the board of directors of MEDNAX, Inc. (NYSE: MD), a neonatal and anesthesia physician practice management company, where he serves as Audit Committee Chairman and a member of the Executive Committee of the board of directors. Prior to his employment with Lincare, he was with Dean Witter Reynolds Inc. and also worked for Coopers & Lybrand. Mr. Gabos holds a B.S. in Economics from The Wharton School of the University of Pennsylvania. Mr. Gabos provides the Board with years of financial reporting experience in the healthcare industry, knowledge of healthcare, and familiarity with the operation of company boards of directors and their committees.

**Defendant Murley**

---

[12] This figure includes awards of 15,700 restricted shares that had not yet vested as of April 7, 2017.

67.     Defendant Robert Murley ("Murley") has served as a Company director since 2014 and is a member of the Audit Committee. According to the 2017 Proxy Statement, as of April 7, 2017, Defendant Murley beneficially owned 25,700 shares of the Company's common stock.[13] Given that the price per share of the Company's common stock at the close of trading on April 7, 2017 was $16.45, Murley owned approximately $422,765 worth of HIIQ stock.

68.     For the fiscal year ended December 31, 2016, Defendant Murley received $80,000 in compensation from the Company, comprised of $35,000 in fees paid or earned in cash, and $45,000 in stock awards.

69.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Murley sold 10,000 shares of Company stock on March 9, 2017, from which he benefited in the amount of approximately $158,210. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

70.     The Company's 2017 Proxy Statement stated the following about Defendant Murley:

> **Robert S. Murley** (age 67). Robert S. Murley has served as a director since October 2014. Mr. Murley is currently the Vice Chairman-Senior Advisor of Credit Suisse, LLC, having served in a number of senior leadership roles for almost 40 years with the firm, after beginning his career in New York. He later relocated to the Chicago office, where he served as the office head from 1991 to 2005. In 1999, he co-founded the Global Industrial and Services Group, one of the firm's largest industry practices. In 2005, Mr. Murley was appointed as Chairman of Investment Banking for the Americas, serving in that position until April 2012, when he was appointed Vice Chairman-Senior Advisor. Mr. Murley currently serves as a director of one publicly-traded company: Stericycle Inc (NASDAQ: SRCL). His civic activities include serving as Chair of the Board of Overseers of the UCLA Anderson

---

[13] This figure includes awards of 15,700 restricted shares that had not yet vested as of April 7, 2017.

School of Management, Emeritus Trustee of Princeton University, Chairman of the Board of the Educational Testing Service and trustee of the Museum of Science and Industry of Chicago. Mr. Murley received his B.A. from Princeton University, his M.B.A. from the UCLA Anderson School of Management and his M.S. in International Economics from the London School of Economics. Mr. Murley's existing public company board experience and his deep knowledge of the capital markets, the economy and his long history of advising many large corporations on advisory and capital raising assignments makes him a valuable member of the Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

71.     By reason of their positions as officers, directors, and/or fiduciaries of HIIQ and because of their ability to control the business and corporate affairs of HIIQ, the Individual Defendants owed HIIQ and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage HIIQ in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of HIIQ and its shareholders so as to benefit all shareholders equally.

72.     Each director and officer of the Company owes to HIIQ and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

73.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of HIIQ, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

74.     To discharge their duties, the officers and directors of HIIQ were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

75.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of HIIQ, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised HIIQ's Board at all relevant times.

76.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

77.     To discharge their duties, the officers and directors of HIIQ were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

24

controls of the Company. By virtue of such duties, the officers and directors of HIIQ were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to HIIQ's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how HIIQ conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of HIIQ and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that HIIQ's operations would comply with all applicable laws and HIIQ's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

78.     Each of the Individual Defendants further owed to HIIQ and the shareholders the duty of loyalty requiring that each favor HIIQ's interest and that of its shareholders over his own while conducting the affairs of the Company and refrain from using his position, influence or knowledge of the affairs of the Company to gain personal advantage.

79.     At all times relevant hereto, the Individual Defendants were the agents of each other and of HIIQ and were at all times acting within the course and scope of such agency.

80.     Because of their advisory, executive, managerial, and directorial positions with HIIQ, each of the Individual Defendants had access to adverse, non-public information about the Company.

81.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by HIIQ.

**<u>CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION</u>**

82.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

26

83.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; (iii) to engage in the Regulatory Misconduct and Sales Misconduct; and (iv) to artificially inflate the Company's stock price while the Company repurchased its own stock.

84.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of HIIQ, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

85.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

86.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of HIIQ and was at all times acting within the course and scope of such agency.

## HIIQ'S CODE OF ETHICS

87.     The Company's Code of Ethics and Business Conduct (the "Code of Ethics"), states that: "[a]ll of our employees, officers and directors must conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior."

88.     The Code of Ethics provides, as to "Compliance with Laws," that "[w]e are strongly committed to conducting our business affairs with honesty and integrity and in full compliance with all applicable laws, rules and regulations. No employee, officer or director of the Company shall commit an illegal or unethical act, or instruct others to do so, for any reason."

89.     The Code of Ethics provides, as to "Trading on Inside Information," that:

Using non-public, Company information to trade in securities, or providing a family member, friend or any other person with a "tip", [sic] is illegal. All such non-public information should be considered inside information and should never be used for personal gain. You are required to familiarize yourself and comply with the Company's policy concerning trading in Company securities, copies of which are distributed to all employees, officers and directors and are a part of the Company's employee materials. You should contact the Code Compliance Officer with any questions about your ability to buy or sell securities.

90.     The Code of Ethics provides, as to "Fair Dealing," that:

Each employee, officer and director of the Company should endeavor to deal fairly with members, carriers, distributors, customers, suppliers, competitors, the public and one another at all times and in accordance with ethical business practices. ***No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice.***

(Emphasis added.)

91.     The Code of Ethics provides, as to "Quality of Public Disclosures," that:

> The Company has a responsibility to provide full and accurate information in our
> public disclosures, in all material respects, about the Company's financial condition
> and results of operations. ***Our reports and documents filed with or submitted to
> the Securities and Exchange Commission and our other public communications
> shall include full, fair, accurate, timely and understandable disclosure***.

(Emphasis added.)

92.     The Code of Ethics provides that all employees, officers and directors are expected

to report violations of the Code of Ethics, stating, in relevant part:

> Any concerns about violations of laws, rules, regulations or this Code by any senior
> executive officer or director should be reported promptly to the Code Compliance
> Officer, and the Code Compliance Officer is responsible for appropriately notifying
> the Nominating and Corporate Governance Committee of violations . . . The Company
> encourages all employees, officers and directors to report any suspected violations
> promptly and intends to thoroughly investigate any good faith reports of violations.

93.     In violation of the Code of Ethics, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' scheme to issue

materially false and misleading statements to the public and to facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse

of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b)

and 20(a) of the Exchange Act. Several of the Individual Defendants violated the code by selling

shares of Company stock while in possession of material, non-public information about the

Company. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to

maintain the accuracy of Company records and reports, comply with laws and regulations, conduct

business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## BACKGROUND

94.     HIIQ is a holding company whose sole asset is a 35% stake in the aggregate

membership interest of Health Plan Intermediaries, Holdings LLC ("HPIH"). According to the

registration statements filed in connection with the Company's 2013 initial public offering, "[o]ur

only business after this offering will be to act as sole managing member of Health Plan Intermediaries Holdings, LLC."

95.     HIIQ develops, distributes and administers short-term medical plans, hospital indemnity plans, and "supplementary products," which the Company describes as including pharmacy benefit cards, dental plans, vision plans, and life insurance policies. HIIQ's target market is the large segment of U.S. consumers who are uninsured or underinsured.

96.     The Company markets its products through both an "internal distribution network" of Company-owned websites and an "external distribution network consisting of independently owned and operated" call centers.

97.     Customers pay premiums and an enrollment fee to HIIQ directly. The Company in turn retains the enrollment fee, transfers the premium payment to the underwriting insurer, and remits commissions originating from the underwriter to the third-party call center that sold each particular policy, as demonstrated in the following hypothetical example prepared by the Office of the Montana State Auditor, Commissioner of Securities and Insurance ("CSI"):



98.     The Company also acts as a TPA, serving as a middleman between health insurers and customers.

99.     HIIQ's products are sold outside of the marketplace established by the Affordable Care Act ("ACA"), and therefore need not comply with many ACA regulations, such as providing coverage of pre-existing conditions. As a result, short-term medical polices, health benefit plans, and ancillary insurance administered by HIIQ are not considered to be qualifying health coverage under the ACA.

### *Third Party Administrator License Application in Florida*

100.     At all relevant times, the Company acknowledged that "state regulators require us to maintain a valid license in each state in which we transact health insurance business and further require that we adhere to sales, documentation and administration practices specific to each state."

101.     The Company has been licensed to operate as a TPA in a number of states prior to applying for a TPA license in Florida. In its 2012 TPA application to the state of Illinois, HIIQ disclosed that it was not licensed in its home state of Florida.

102.     On July 18, 2016, HIIQ filed an application in Florida to become a TPA. A TPA is an organization responsible for processing insurance claims or aspects of employee benefit plans for a separate entity. In the insurance context, TPAs provide other services such as underwriting and customer service.

103.     On July 20, 2016, the Company revealed in a Form 8-K filed with the SEC that it was under investigation in Florida for "sales practices and potential unlicensed sale of insurance by third-party distributor call centers utilized by the Company."

104.     On or before July 25, 2016, the FLOIR had already "deemed that application incomplete and returned it" to the Company.

105.     The Company refiled a TPA Application with the FLOIR on October 28, 2016.

106.    The FLOIR sent HIIQ a clarification letter on November 28, 2016 which sought additional material information that had been omitted from the Company's TPA Application. The letter established a response date of December 5, 2016.

107.    On December 1, 2016, HIIQ requested an extension of the response deadline to December 12, 2016. This request was granted by the FLOIR.

108.    Even with the requested an obtained extension, HIIQ did not file a response with FLOIR by December 12, 2016.

109.    The Company wrote a private letter to the FLOIR on December 16, 2016, wherein it admitted that it had failed to timely reapply and "requested an unspecified extension of time to gather the remaining information." As articulated in the FLOIR's June 1, 2017 letter to HIIQ, "[t]hat same day, with no action from the Office granting or denying the request for an extension of time, Applicant withdrew the application."

110.    The FLOIR advised HIIQ, in a letter dated December 16, 2016, that "until your application has been approved by the office and the appropriate licensure issued, the referenced company *should not transact business* that requires such license in this state." The Company failed to disclose this negative material development to its shareholders in any of its SEC filings during the Relevant Period.

111.    The FLOIR advised the Company that its TPA Application could be effectively restated without incurring additional fees if the Company resubmitted its application within sixty days of December 16, 2016—February 14, 2017.

112.    The Company refiled its TPA application with the FLOIR on April 19, 2017.

113.    On June 1, 2017, the FLOIR sent HIIQ a private letter informing the Company that its TPA Application had been denied. The letter indicated that the denial was a result of the

Company's "fail[ure] to correct errors or omissions in the application" and "supply additional information when requested by the Office" and the FLOIR's determination that HIIQ was "not competent." The letter described these as "numerous, **material** errors and omissions." (Emphasis added.)

114.    Information the Company failed to provide included details on premiums collected and claims paid out by insurance companies it worked with, and information explaining the Defendant Koloske's indication that he had been an officer, director, trustee or controlling stockholder of a company when that company had had its permit, license, or certificate of authority suspended, revoked, canceled, or subject to a similar action.

115.    Among the errors or omissions noted in the letter was the failure to disclose "civil action[s] involving dishonesty, breach of trust, or a financial dispute" against Defendants Kosloske and Hershberger. Background investigations on these two Defendants had uncovered two civil actions against Defendant Kosloske in Florida state court and two civil actions against Defendant Hershberger in Wisconsin state court.

116.    Further, the June 1, 2017 letter noted that "Applicant has submitted a new application for filing for review three times over eight months, and has been provided two separate sets of clarification letters, and has been granted numerous extensions of time to submit supplemental responses."[14]

117.    The Company responded to the FLOIR in a private letter dated June 16, 2017. In their letter, the Company erroneously characterized the FLOIR as a "notice proposing to deny" the TPA Application, as opposed to a denial of the Company's application. Representing that it had

---

[14] Defendants were informed of the denial and reasons therefor by outside counsel no later than June 4, 2017.

TPA licenses in "over twenty states where such licensure is required," HIIQ outlined what it believed to be the impact of the FLOIR's denial on the Company's business:

> The application denial would trigger a duty to report (and thus raise the specter of additional denials) in many of those states as well, and every state in which [the Company] would seek to pursue any form of insurance-related licensure in the future (thus raising the specter of a domino effect of denials that would have to be reported); *to say that the interests of [the Company] as an entity would be substantially affected is a radical understatement*.

(Emphasis added.)

118.    Neither the FLOIR's denial, nor the Company's response, was disclosed to investors until the Company filed its quarterly report with the SEC on Form 10-Q on August 4, 2017.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

119.    The Individual Defendants engaged in and/or caused the Company to engage in the Regulatory Misconduct and Sales Misconduct. The Regulatory Misconduct and the Sales Misconduct resulted in numerous investigations by state regulators, as well as a decline in the value of the Company, and, correspondingly, shareholder value.

### *The Sales Misconduct*

120.    Beginning in 2016, HIIQ has come under scrutiny for its use of third-party call centers. State regulators and consumers have alleged that representatives from such call centers made false or deceptive representations to consumers in order to sell the Company's short-term insurance policies. According to the Annual Report filed on Form 10-K with the SEC on March 2, 2017:

> The Indiana Department of Insurance is serving as the managing participant of the multistate examination, and the examination includes, among other things, *a review of whether the insurance company (and our Company) has engaged in any unfair or deceptive acts or insurance business practices*. As of March 1, 2017, forty-two states have joined the multistate examination.

(Emphasis added.)

121.    Some state investigations have resulted in accusations of fraud and deception against the Company, as well as regulatory action.

122.    The Arkansas Insurance Department issued a press release on March 28, 2016, announcing that it had issued a Cease and Desist Order against HIIQ, which required the Company "and its affiliates to immediately stop the sale, solicitation, or advertising of any health plans or medical insurance using unlicensed agents, and stop intentionally misrepresenting the terms of an insurance contract or application for insurance." The press release reported that the Cease and Desist Order was issued "over allegations the company has used ***fraudulent and dishonest practices*** in attempting to sell short-term health care plans." (Emphasis added.)

123.    The March 28, 2016 press release stated as follows:

**LITTLE ROCK –** Arkansas Insurance Commissioner Allen Kerr today released the following statement regarding a Cease and Desist Order issued against Health Plan Intermediaries Holdings, LLC., dba Health Insurance Innovations (HII), a Tampa, Florida-based company, over allegations the company has used fraudulent and dishonest practices in attempting to sell short-term health care plans to Arkansans, claiming the plans were compliant with the Affordable Care Act:

"The Arkansas Insurance Department takes very seriously its charge to protect Arkansas consumers from fraud. We will not allow unlicensed individuals to prey upon our neighbors with non-compliant health insurance plans under the promise of avoiding a tax penalty."

The Cease and Desist Order requires HII and its affiliates to immediately stop the sale, solicitation, or advertising of any health plans or medical insurance using unlicensed agents, and stop intentionally misrepresenting the terms of an insurance contract or application for insurance. The order can be **read here**.

AID investigators engaged in a phone call with an HII employee who offered insurance plans, and provided price quotes for HII products, despite admitting he was not a licensed insurance agent. Additionally, several company representatives made misleading statements to investigators about two HII short-term health plans, "HealtheFlex" and "Principal Advantage Plan," that they were ACA-compliant plans that would allow a consumer to avoid receiving a tax penalty.

Kerr added: "This is the first step in our investigation into the practices of Health Insurance Innovations in Arkansas. I strongly encourage anyone who has received a sales call from HII, or has purchased one of these plans, to contact the Insurance Department."

124.    On May 9, 2016, the CSI filed an action against HIIQ for "routinely" selling insurance policies "through misinformation and deception," characterizing HIIQ's actions as a "scheme" to defraud Montana residents. The CSI entered an Order directing HIIQ to "cease and desist from selling, negotiating, transacting, administering, or otherwise take part in or benefit from any insurance transaction in, to, or from Montana, or attempt to do any of the same." The Company's Montana license has been suspended since the state entered the Cease and Desist Order 2016.

125.    The CSI alleged, in a Notice of Proposed Hearing issued on May 9, 2016, that HIIQ "enrolled thousands of Montanans in short term medical plans, and HII[Q] received at least $449,000 in administrative fees and another $54,000 in premium[s] [between January 1, 2012 and April 20, 2015]" and that "[n]one of the HII[Q] entities have ever been certified as administrators in Montana, or have requested or received waiver of the certification requirement."

126.    In the Notice of Proposed Hearing, the CSI refers to the misconduct alleged as the "HII scheme" and specifically highlights the Company's role. Contrary to the Company's assertions in SEC filings during the Relevant Period, the CSI focuses almost exclusively on the actions of the Company and its subsidiaries, as evidenced by the following excerpt from the Notice:

<u>HII Scheme</u>

5.    The HII entities, identified below, solicited insurers to underwrite short term medical and excepted benefit policies, and then organized an extensive operation of insurance producers to sell those policies.   Typically, the insurance producers will have only one person licensed to sell insurance, but will employ numerous sales representatives in a call center-style operation to actually sell the insurance products to Montana consumers.  The contractual relationships are described in the following graphic:



The other entities listed by the CSI and emphasized by the Company in its SEC filings are predominantly underwriters whose health insurance products the Company sells in Montana or individual insurance producers listed on HIIQ-administered insurance policies sold to Montana residents.

127.    On June 8, 2016, an Examination Warrant was issued to the Company by the Commissioner of the Indiana Department of Insurance. The warrant indicated that the Market Actions Working Group of the National Association of Insurance Commissioners had accepted a request for a review of the Company's "sales marketing and administration of short term medical plans and ACA plans" between Mach 23, 2010 and April 30, 2016. Such review was to be

conducted in conjunction with a multistate examination of HCC Life Insurance Company ("HCC"). HCC was previously one of HIIQ's affiliated insurers.

128.    On June 16, 2016, the Company received notification of a civil investigative demand from the Massachusetts Attorney General's Office, requesting information and documents to facilitate their review of the Company's sales and marketing practices. The investigation is focused on the Company's compliance with Massachusetts laws and regulations and seeks to determine that the Company's sales and marketing practices are not deceptive or constitute unfair trade practices.

129.    The Company disclosed these investigations on July 20, 2016 in a Form 8-K filed with the SEC. Following a long and detailed description of Defendant Southwell's appointment and employment agreement, and a similarly lengthy and detailed description of the appointment and employment agreement of a new Chief Operating Officer, the Form 8-K concluded with a disclosure of the pending state regulatory actions. In relevant part, the Form 8-K stated:

> In addition to the multistate examination led by Indiana, we are aware that ***several other states,*** including Arkansas, Florida, Kansas, Montana, Ohio, South Dakota, and Massachusetts, ***are reviewing the sales practices and potential unlicensed sale of insurance*** by third-party distributor call centers utilized by the Company.

(Emphasis added.)

130.    Notably, the July 20, 2016 8-K did not disclose the sanctions levied against the Company in Montana and Arkansas.

131.    The July 20, 2016 8-K reported that "[t]he Company is proactively communicating and cooperating with all applicable regulatory agencies, and [Defendant] Southwell, with his strong skills and experience with insurance regulatory matters, will lead the Company's efforts in responding to and addressing any such regulatory matters."

*The Regulatory Misconduct*

132.    On September 1, 2017, HIIQ filed an application to renew its TPA license in Illinois. That application specifically asked whether the Company had ever been "refused a license to act as a Third Party Administrator, agent, producer, or solicitor, or has a license to act as such ever been denied, suspended, revoked, or surrendered for regulatory reasons in any state either as an individual or as a member of entity?" Defendants Southwell and Hershberger, under penalty of perjury, personally signed the document and answered the foregoing question in the negative. However, Defendants Southwell and Hershberger had signed a Form 10-Q filed with the SEC on August 4, 2017, in which the Company had disclosed the FLOIR's denial of the Company's TPA application, and both would have been aware of Montana's suspension of HIIQ's license because of their position as executives of HIIQ and the fact that the sale of insurance is the Company's core operation.

133.    On October 31, 2017, HIIQ filed a TPA license application with the State of Montana. The application included notarized affidavits signed by Defendants Southwell and Hershberger that, to their knowledge, they had never been an officer of a company that "[h]ad its permit, license, or certificate of authority suspended, revoked, canceled, non-renewed, or subjected to any judicial, administrative, regulatory, or disciplinary action . . ." Defendant Kosloske answered the question in the affirmative, indicating that he had been in such a position, but did not provide any details in the follow-up question asking for explanation.

134.    Defendants Southwell's and Hershberger's statements referenced above were materially false and misleading because they were officers of HPIH, which had been subject to at

least three regulatory actions in 2016 alone, including the suspension of the Company's license in Montana.[15]

135.    On February 14, 2018 the Company disclosed that the FLOIR had executed a Consent Order which, *inter alia*, "assessed a fine of $140,000 as a result of a finding by the OIR (which HPHI did not contest) that HPIH conducted business as an insurance administrator in the State of Florida prior to HPIH's submission of the application."

**False and Misleading Statements During the Relevant Period**

136.    As a result of the foregoing, and as described further below, certain of the Company's statements directed at the investing public were materially false and misleading during the Relevant Period. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact.

*3Q 2016 10-Q and Earnings Call*

137.    On November 3, 2016, the Company filed with the SEC its quarterly report for the fiscal quarter ended September 30, 2016 on a Form 10-Q (the "3Q 2016 10-Q"), which was signed by Defendant Hershberger.

138.    The 3Q 2016 10-Q reported that "[t]here were no material changes to the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2015,[16] other than the following new risk factor," which was a new federal short-term medical insurance rule.

---

[15] While Defendant Hershberger signed his Affidavit on June 2, 2016 -- before the Indiana warrant was filed, he still would have been aware of the Montana and Arkansas actions.

[16] The Company's 2015 Annual Report was filed with the SEC on March 8, 2016 on Form 10-K, referred to hereinafter as the "2015 10-K."

139.    The 3Q 2016 10-Q also represented that "[i]n addition to the multistate examination led by Indiana, we are aware that several other states, including Arkansas, Florida, Kansas, **Montana**, Ohio, South Dakota, Texas and Massachusetts, are **reviewing the sales practices and potential unlicensed sale of insurance** by third-party distributor call centers utilized by the Company." (Emphasis added.)

140.    Attached to the 3Q 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Hershberger and non-party Patrick R. McNamee ("McNamee") attesting to the accuracy of the 3Q 2016 10-Q.

141.    The Company held an earnings call on November 3, 2016 to discuss its financial results for the quarter ended September 30, 2016. Defendant Hershberger and non-party McNamee participated in the call, neither of whom disclosed the existence of negative developments in Montana during the call.

142.    The statements in ¶¶ 137-41 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) subsequent to the filing of the 2015 10-K but prior to the filing of the 3Q 2016 10-Q, material developments not disclosed in the 3Q 2016 10-Q had occurred with respect to the Company's operations that posed a risk to investors, including the State of Montana moving beyond "reviewing the [Company's] sales practices and potential unlicensed sale of insurance;" (2) the Company engaged in the Regulatory Misconduct and Sales Misconduct; (3) the Company had failed to maintain internal controls; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable. basis in fact

143.    Specifically, as alleged above, on May 9, 2016, the State of Montana, through the CSI, filed an action against HIIQ, alleging that the Company was "routinely" selling insurance policies "through misinformation and deception." The action described HIIQ's conduct as a "scheme" to defraud Montana residents. In addition to accusing HIIQ of engaging in "misinformation and deception," the CSI entered a Cease and Desist Order against HIIQ requiring the Company to "immediately cease and desist from selling, negotiating, transacting, administering, or otherwise take part in or benefit from any insurance transaction in, to or from Montana . . ." The Cease and Desist Order also summarily suspended all of HIIQ's Montana insurance licenses pending a hearing.

### *March 2, 2017 SEC Filings*

144.    On March 2, 2017, the Company filed a press release with the SEC as an exhibit to Form 8-K. The press release failed to disclose, in the section entitled "Regulatory Update" or elsewhere, that the Company had withdrawn its Florida TPA application on December 16, 2016 as a result of the Company's sustained and numerous failures to accurately complete the application.

145.    The press release further failed to disclose that, in response to HIIQ's withdrawal of the Florida TPA application, the FLOIR had advised HIIQ that "until your application has been approved by the [FLOIR] and the appropriate licensure issued, the referenced **company should not transact business that requires such license in this state**." (Emphasis added.)

146.    The press release represented that "[i]n addition to the multistate examination led by Indiana, we are aware that several other states, including Arkansas, Florida, Kansas, Massachusetts, **Montana**, Ohio, South Dakota, and Texas are **reviewing alleged non-compliance**

**with sales practices, non-compliance with insurance laws, and/or unlicensed sale of insurance** by third-party distributor call centers utilized by the Company." (Emphasis added.)

147.    On March 2, 2017, the Company filed with the SEC its annual report for the fiscal year ending December 31, 2016 on a Form 10-K (the "2016 10-K"), which was signed by Defendants Southwell, Hershberger, Kosloske, Gabos, and Murley.

148.    The 2016 10-K represented that "[i]n addition to the multistate examination, the Office of the Montana State Auditor, Commissioner of Securities and Insurance ('CSI') has initiated an administrative action against us." This constituted the first public acknowledgment by the Company of the Montana action, nine months after it had been initiated. However, this statement in the 2016 10-K was materially false and misleading in that it failed to disclose that the State of Montana had accused HIIQ of engaging in a fraudulent "scheme" against Montana residents.

149.    Attached to the 2016 10-K were SOX certifications signed by Defendants Southwell and Hershberger, attesting to the accuracy of the 2016 10-K.

150.    The statements in ¶¶ 144, and 146-49 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) subsequent to the filing of the 2015 10-K but prior to the filing of the 3Q 2016 10-Q, material developments not disclosed in the 3Q 2016 10-Q had occurred with respect to the Company's operations that posed a risk to investors, including that the State of Montana moving beyond "reviewing the [Company's] sales practices and potential unlicensed sale of insurance;" (2) the State of Montana had accused HIIQ of engaging in a fraudulent "scheme" against Montana residents; (3) the Company had withdrawn its Florida TPA application on December 16, 2016 or

the FLOIR's response thereto; (4) the Company engaged in the Regulatory Misconduct and Sales Misconduct; (5) the Company had failed to maintain internal controls; and (6) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact.

### March 2017 Prospectus Supplement

151.    On March 8, 2017, the Company filed a Final Prospectus Supplement with the SEC on Form 424B3 (the "Prospectus Supplement"). The Prospectus Supplement announced that "[t]he selling stockholders identified in this prospectus supplement are offering 3,000,000 shares of our Class A common stock, which are to be issued upon the exchange of an equivalent number of Series B Membership Interests (together with an equal number of shares of our Class B common stock) of Health Plan Intermediaries Holdings, LLC" (the "Secondary Offering"). The Prospectus Supplement identified the public offering price as $14.00 per share, with the offering expected to close on or about March 13, 2017.

152.    All shares included in the Secondary Offering were offered and sold by entities owned and controlled, whether directly or indirectly, by Defendant Kosloske. HIIQ did not sell any shares in the Secondary Offering, and Defendant Kosloske received all net proceeds from the Secondary Offering.

153.    In response to the announcement of the Secondary Offering, the price of HIIQ stock fell $1.70, or 9.8%, from the previous day's closing price to close at $15.65 per share on March 8, 2017.

154.    The Prospectus supplement was materially false and misleading because it incorporated by reference the Company's 2016 10-K, for the same reasons that the 2016 10-K was materially false and misleading, as articulated in ¶150.

### 2017 Proxy Statement

155.    The Company's 2017 Proxy Statement stated, in relevant part, that:

The Board has adopted and adheres to Corporate Governance Principles and a Code of Business Conduct and Ethics that the Board and senior management believe represent sound practices. We have a longstanding belief that ethical behavior and respect for the law are fundamental to our culture and our business practices. It is the foundation of the policies and practices of our Code of Business Conduct and Ethics to manage our Company with integrity and in our stockholders' best interests. We are committed to conducting our business in strict compliance with both the letter and the spirit of the law and with the highest standards of professional and ethical conduct.

156.    The 2017 Proxy statement was false and misleading because, despite assertions to the contrary, the Company's Code of Business Conduct and Ethics was not followed, as multiple Defendants engaged in insider trading, the Regulatory Misconduct and Sales Misconduct while allowing false and misleading statements to be issued to the investing public.

157.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements based on, *inter alia*, market price of a share and market price appreciation of share value, while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made and/or caused to be made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

158.    The 2017 Proxy Statement also failed to disclose that the Company: (1) engaged in the Regulatory Misconduct and Sales Misconduct; and (2) had not maintained adequate internal controls.

### Q1 2017 10-Q

159.    The Company filed with the SEC a quarterly report on Form 10-Q for the quarter

ending March 31, 2017 on May 4, 2017 (the "Q1 2017 10-Q"), which was signed by Defendants

Southwell and Hershberger.

160.    Attached to the Q1 2017 10-Q were SOX certifications signed by Defendants

Southwell and Hershberger, attesting to the accuracy of the Q1 2017 10-Q.

161.    The Q1 2017 10-Q was false and misleading for the same reasons alleged in ¶ 150.

*2017 Registration Statement*

162.    On May 5, 2017, the Company filed a Registration Statement on Form S-3 (the

"2017 Registration Statement"), to offer and sell up to $150 million worth of: "(a) debt securities,

(b) Class A common stock, (c) preferred stock, (d) warrants to purchase common stock, preferred

stock or debt securities, (e) subscription rights, (f) units and (g) purchase contracts" to the investing

public. The 2017 Registration Statement was signed by Defendants Southwell, Hershberger,

Kosloske, Avery, Barkett, Gabos, and Murley. The 2017 Registration Statement was declared

effective May 19, 2017.

163.    The 2017 Registration Statement incorporated by reference the 2016 10-K and Q1

2017 10-Q and thus was false and misleading for the reasons articulated in ¶ 150.

*Failure to Disclose FLOIR's Denial of HIIQ's TPA Application*

164.    On June 1, 2017, FLOIR sent a letter to HIIQ informing the Company that its TPA

Application had been denied and outlining the reasons for such denial. Reasons for the denial

included the FLOIR's conclusion that the Company's application "contained numerous, material

errors and omissions," and that the Company was "not competent."

165.    Despite the Company's earlier, private, admission of the importance of the TPA

Application to the FLOIR, HIIQ did not immediately report this material negative development in

a Form 8-K filed with the SEC or otherwise. Instead, the Company waited to merely partially disclose the information several months later in August 2017.

### 2Q 2017 10-Q, Earnings Call, and Press Release

166.    On August 3, 2017, the Company filed a press release as an exhibit to a Form 8-K filed with SEC, announcing its financial results for the quarter ended June 30, 2017.

167.    The press release was materially false and misleading because it failed to disclose that the FLOIR had denied HIIQ's TPA Application. In fact, the Company deviated from its usual practice and did not include a Regulatory Update section in the August 3, 2017 Form 8-K.

168.    The Company held an earnings call with analysts and investors on August 3, 2017, breaking the Company's usual practice of holding earnings calls on the same day as, not prior to, the filing of a Form 10-Q.

169.    During the call, an analyst asked Defendant Southwell to "go into more details" regarding the Company's "efforts on improved compliance," explaining that "obviously, there you have outstanding litigation and I guess regulatory oversight here . . ." Defendant Southwell misleadingly downplayed the significance of these regulatory issues, characterizing them as "a lot of noise . . . that comes from kind of historic items."

170.    As evidenced by the language in the Company's June 16, 2017 appeal to the FLOIR and the Company's misleading statements in its Illinois and Montana Applications, the Florida rejection was an imminent and serious threat to the Company's operations. Defendant Southwell knew of the importance of the TPA Application because, as reported in the Form 8-K filed with the SEC on July 20, 2016, Defendant "Southwell, with his strong skills and experience with insurance regulatory matters, will lead the Company's efforts in responding to and addressing any such regulatory matters."

171.    On August 4, 2017 the Company filed with the SEC a quarterly report for the

quarter ending June 30, 2017 on Form 10-Q (the "2Q 2017 10-Q"), which was signed by

Defendants Southwell and Hershberger.

172.    The 2Q 2017 10-Q stated, with respect to the TPA application, as follows:

> Many states have statutes that require the licensure of third-party insurance
> administrators ("TPA"). The statutes and applicable regulations vary from state-to-
> state with respect to the nature of the business activities that may require licensure.
> Where the Company believes that statutes are unclear or open to interpretation, it
> takes the prudent approach of applying for a TPA license. Therefore, the Company
> applied for a TPA license with the Florida Office of Insurance Regulation
> ("OIR"). In June 2017, the ***OIR denied the Company's application based on its
> determination that the Company had not yet provided all information required to
> process the application.*** In June 2017, the Company appealed the denial with the
> Florida Division of Administrative Hearings. A final hearing on the matters has
> been scheduled for October 17-20, 2017, but the Company is working with the OIR
> to reach a mutually agreeable resolution of the matter prior to the hearing, ***including
> discussing whether the OIR will require the Company to hold such a license at
> all.***

(Emphasis added.)

173.    The 2Q 2017 10-Q stated that "the OIR denied the Company's application based

on its determination that the Company had not yet provided all information required to process the

application," and that the Company had "appealed the denial." Such statements failed to disclose

the material consequences of the TPA Application denial stated in the Company's written appeal

dated June 16, 2017, which stated, in relevant part:

> The application denial would trigger a duty to report (and thus raise the specter of
> additional denials) in many of those states as well, and every state in which [the
> Company] would seek to pursue any form of insurance-related licensure in the
> future (thus raising the specter of a domino effect of denials that would have to be
> reported); ***to say that the interests of [the Company] as an entity would be
> substantially affected is a radical understatement***.

(Emphasis added.)

174.   Attached to the 2Q 2017 10-Q were SOX certifications signed by Defendants Southwell and Hershberger, attesting to the accuracy of the 2Q 2017 10-Q.

175.   The statements in ¶¶ 166-69 and 170-74 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) following HIIQ's withdrawal of its TPA Application, the FLOIR had warned the Company in December 2016 that it "should not transact business that requires such license in this state;" (2) FLOIR had denied the Company's critically important TPA license due to, *inter alia*, Florida's discovery of undisclosed legal actions against Company insiders and finding that the Company was "not competent;" (3) the Company privately warned FLOIR of the anticipated "domino effect" that the rejection was likely to cause, by which the Company would subsequently lose licenses in other states; (4) the Company had disregarded the FLOIR's instructions and intentionally omitted material information in its TPA Application; (5) the TPA license denial adversely affected the Company's other licenses and future license applications; (6) the denial was substantially harming the Company's ability to conduct its core business operations; (7) the Company engaged in the Regulatory Misconduct and Sales Misconduct; (8) the Company failed to maintain internal controls; and (9) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact.

### The Truth Emerges

176.   On September 11, 2017, a whistleblower report entitled "Short $HIIQ: Fraud Penalties to Exceed $100 Million and Undisclosed 'Domino Effect'" (the "Pearson Exposé"), which revealed that Defendants had made material misstatements and omissions regarding the risks flowing from the Florida TPA Application process and ultimate denial.

177.     The Pearson Exposé included the previously undisclosed, non-public letter from FLOIR, denying HIIQ's TPA Application dated June 1, 2017. This letter included information regarding HIIQ's repeated failure to provide requested information to the FLOIR in its three application filings, made over a period of eight months. The letter also outlined the basis for the FLOIR's denial of the TPA Application.

178.     The Pearson Exposé included the Company's appeal of the TPA Application denial, dated June 16, 2017. The June 16, 2017 letter contained following statement, which revealed the materiality of the FLOIR's denial of HIIQ's TPA Application:

> The application denial would trigger a duty to report (and thus raise the specter of additional denials) in many of those states as well, and every state in which [the Company] would seek to pursue any form of insurance-related licensure in the future (thus raising the specter of a domino effect of denials that would have to be reported); to say that the interests of [the Company] as an entity would be substantially affected is a radical understatement.

179.     The Pearson Exposé included regulatory documents from Montana and Arkansas, disclosing the Company's regulatory and compliance failures and penalties. The documents from the State of Montana revealed that the State had found that HIIQ had engaged in a "scheme" to defraud consumers.

180.     In response to the Pearson Exposé, the Company's share price dropped nearly 22%, or $6.55, over the course of the trading day, closing at $23.35 on September 11, 2017.

181.     The price of the Company's shares continued to drop, losing 15% of their value, or $3.60, and closing at $19.75 on September 12, 2017.

### HIIQ's Misleading Response to the Pearson Exposé

182.     On September 12, 2017, the Company filed a Form 8-K with the SEC that attached a press release. That press release admitted that the FLOIR had "denied the Company's application for licensure as a TPA based on the OIR's determination that the Company had not provided all

information required to process the application." However, the Company misleadingly omitted the

FLOIR's conclusions that the applications "contained numerous, material errors and omissions,"

and that HIIQ was "not competent."

183.    Regarding the "domino effect" comment that had been included in the Pearson

Exposé, the Company asserted:

> In addition to the above, a third party yesterday took out of context a statement
> made by counsel to the Company in a letter to OIR regarding a "domino effect".
> [sic] The ***Company's counsel was making a reference to the fact that an
> application denial would likely be a disclosure item on all future licensing in
> other states, which would add significant work to future licensing efforts in those
> states***.

(Emphasis added.)

184.    Further, the press release admitted, contrary to the Company's representations in

the 2Q 2017 10-Q, that "based on discussions with the OIR, the Company determined that its

business activities likely require licensure as a TPA even though the Company is not a traditional

TPA." However, the Company did not provide any basis for its conclusion that such licensure

would merely be likely, unlike in the majority of other states where the Company operates pursuant

to a TPA license.

185.    Finally, the press release stated that "[t]he OIR has not to date informed the

Company that it intends to request that the Company modify its business activities in Florida, and

the Company is in regular communication with the OIR on other compliance matters." However,

such statement was in direct contradiction of the FLOIR's statement in its December 16, 2017

letter that "until your application has been approved by the [FLOIR] and the appropriate licensure

issued, the referenced company ***should not transact business that requires such license in this

state***." (Emphasis added.)

186.    The September 12, 2017 press release made omissions of material fact that failed to disclose that: (1) following HIIQ's withdrawal of its TPA Application, the FLOIR had warned the Company in December 2016 that it "should not transact business that requires such license in this state;" (2) FLOIR had denied the Company's critically important TPA license due to, *inter alia*, Florida's discovery of undisclosed legal actions against Company insiders and finding that the Company was "not competent;" (3) the true nature of the Company's private warning to the FLOIR of the anticipated "domino effect" that the rejection was likely to cause, by which the Company would subsequently lose licenses in other states; (4) the TPA license denial adversely affected the Company's other licenses and future license applications; (5) the denial was substantially harming the Company's ability to conduct its core business operations; (6) the Company engaged in the Regulatory Misconduct and Sales Misconduct; (7) the Company failed to maintain internal controls; and (8) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact.

### Subsequent Developments in the Florida TPA Application

187.    The FLOIR entered a Consent Order against the Company on October 2, 2017. The Consent Order demanded, among other things, that the Company provide full biographical information for Defendant Kosloske, and that the Company waive its rights to a hearing regarding its renewed application and all rights to challenge or contest the Consent Order.

188.    The Consent Order was executed by Defendant Southwell.

189.    On February 14, 2018 the Company disclosed that the FLOIR had executed another Consent Order, which granted to HPIH a Certificate of Authority to conduct business as a TPA in Florida. In addition, the Consent Order "assessed a fine of $140,000 as a result of a finding by the

52

OIR (which HPHI did not contest) that HPIH conducted business as an insurance administrator in the State of Florida prior to HPIH's submission of the application."

### The Timing and Amount of Sales of Company Stock by Several of the Individual Defendants During the Relevant Period Were Suspicious and Actionable

190.     Several of the Individual Defendants sold large amounts of Company stock during the Relevant Period, including Defendants Kosloske (3 million shares), Wang (155,882 shares), Telkamp (273,775 shares) and Hershberger (112,269 shares).

191.     Some of these insiders established 10b5-1 trading plans during the Relevant Period. However, not all of the insider sales during the Relevant Period were conducted within the scope of such 10b5-1 plans.

192.     Defendant Hershberger established his 10b5-1 trading plan on November 18, 2016 and sold 39,500 shares (more than 20% of his original holdings) between November 17 and November 21, 2016 for proceeds of over $400,000.

193.     Defendants Hershberger, Telkamp and Wang each sold shares during the period between the FLOIR's denial of the Company's TPA application on July 1, 2017 and the date that the denial was revealed to investors (albeit incompletely) on August 4, 2017. During this period, Defendant Hershberger sold 10,000 shares of Company stock, Defendant Telkamp sold 90,000 shares of Company stock and Defendant Wang sold 36,320 shares of Company stock, 21,570 of which were not sold pursuant to a 10b5-1 trading plan.

194.     On May 9, 2017, shortly after the Company had refiled its TPA Application, Defendant Hershberger sold 15,000 shares of Company stock outside of his 10b5-1 plan, for over $305,000 in proceeds.

### Repurchases During the Relevant Period

195.    During the period in which the Company made false and or misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.[17]

196.    According to the Company's financial report for the quarter ended March 31, 2017 filed with the SEC on May 4, 2017 on Form 10-Q, the Company purchased 11,627 shares of its common stock during the month of March 2017 for an average price of $15.86 and a total purchase price of $184,404.

197.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $1.76 more than the actual worth of each share during the month of March 2017. Thus, the total over payment by the Company for its repurchases of its own stock during the month of March 2017 was approximately $20,460.

## DAMAGES TO HIIQ

198.    As a direct and proximate result of the Individual Defendants' conduct, HIIQ have lost and expended, and will lose and expend, many millions of dollars.

199.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, CFO, and Chief of Product Innovation, legal fees associated with the Consumer Class Actions filed against the Company, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

200.    Such costs include, but are not limited to, those incurred related to the investigations arising from the Regulatory Misconduct and Sales Misconduct, including by forty-three States.

---

[17] The amount of stock repurchased and referenced in this subsection includes only shares that were surrendered by employees to satisfy statutory tax withholding obligations in connection with the vesting of stock-based compensation awards.

201.    Such costs include, but are not limited to, the $140,000 fine assessed against the Company by the FLOIR for conducting business as an insurance administrator prior to submitting a license application therefor.

202.    Such losses include, but are not limited to, approximately $20,460 that the Company overpaid, at the direction of the Individual Defendants, for its repurchases of its own stock at artificially inflated prices.

203.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

204.    As a direct and proximate result of the Individual Defendants' conduct, HIIQ has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

205.    Plaintiff brings this action derivatively and for the benefit of HIIQ to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of HIIQ, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

206.    HIIQ is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

207.    Plaintiff is, and has been continuously been since the beginning of the Relevant Period, a shareholder of HIIQ. Plaintiff will adequately and fairly represent the interests of HIIQ in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

208.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

209.    A pre-suit demand on the Board of HIIQ is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Individual Defendants Avery, Barkett, Gabos, Kosloske, Murley, Southwell, and Wang (the "Director-Defendants") and non-party John Fitchthorn (collectively, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight directors who were on the Board at the time this action was commenced.

210.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to engage in the Regulatory Misconduct and Sales Misconduct, and to make false and misleading statements and omissions of material facts, while three of them engaged in insider sales based on material non-public information, netting proceeds of nearly $42.9 million, while, at the same time, they caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

211.   Demand is also excused as to all of the Director-Defendants because the unlawful business strategy that the Company engaged in was not a valid exercise of business judgment. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

212.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the conduct alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more stable, profitable, and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

213.   Additional reasons that demand on Defendant Southwell is futile follow. Defendant Southwell has served as a Company director since July 2016, and as CEO and member of the board since November 2016, shortly after the beginning of the Relevant Period and is thus, as the Company admits, a non-independent director. Indeed, he receives lavish compensation, including over $3.7 million in 2016. Moreover, Defendant Southwell's large Company stock holding, worth approximately $4.6 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. Moreover, Defendant Southwell is a defendant in the Securities Class Action. As a trusted Company director, President, CEO, and the individual the Company had identified as leading "the Company's efforts in responding to and addressing any . . . regulatory matters," Defendant Southwell conducted little, if any, oversight of the Company's engagement in the Regulatory Misconduct and Sales Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate

assets. Defendant Southwell was ultimately responsible for all of the misconduct alleged herein, including the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings, many of which he signed. Defendant Southwell is also responsible for the false statements he personally made to the Illinois Department of Insurance in the Declaration and Certification which represented that HIIQ had never been "refused" a TPA license and had not been denied a "license to act as such . . . in any state." For these reasons, too, Defendant Southwell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214.    Additional reasons that demand on Defendant Kosloske is futile follow. Defendant Kosloske was the Company's President and CEO from 2008 to 2015 and served as the Company's Chief of Product Innovation during the Relevant Period, and is thus, as the Company admits, a non-independent director. He receives lavish compensation, including $1.6 million in 2016. His large Company stock holding, worth approximately $126.9 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. Moreover, Defendant Kosloske is a defendant in the Securities Class Action. His insider sale before the fraud was exposed, which yielded almost $39.5 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Regulatory Misconduct and Sales Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed both the 2016 10-K and the 2017 Registration Statement. Further,

Defendant Kosloske's wife is employed by HIIQ as Chief Broker Compliance Officer: she receives lavish compensation for her position, including $262,445 in 2016. As a result, Defendant Kosloske is unable to evaluate demand with independence, as he may fear retaliation against his wife should he grant any demand. For these reasons, too, Defendant Kosloske breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

215.    Additional reasons that demand on Defendant Wang is futile follow. Defendant Wang has served as a Company director since May 2017, and is the Company's Chief Technology Officer, and is thus, as the Company admits, a non-independent director. Indeed, he receives lavish compensation, including $909,230 in 2016. Moreover, Defendant Wang's large Company stock holding, worth approximately $4 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. His insider sales before the fraud was exposed, which yielded over $3.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director, Defendant Wang conducted little, if any, oversight of the Company's engagement in the Regulatory Misconduct and Sales Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Wang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216.    Additional reasons that demand on Defendant Gabos is futile follow. Defendant Gabos has served as a Company director since August 2013, Board Chair since November 2016 and is the Chair of the Audit Committee. He receives lavish compensation, including $109,500 in

2016. Moreover, Defendant Gabos' large Company stock holding, worth approximately $669,515 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, Chairman of the Board, and Chair of the Audit Committee, Defendant Gabos conducted little, if any, oversight of the Company's engagement in the Regulatory Misconduct and Sales Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed both the 2016 10-K and the 2017 Registration Statement. For these reasons, too, Defendant Gabos breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217.    Additional reasons that demand on Defendant Murley is futile follow. Defendant Murley has served as a Company director since 2014 and is a member of the Audit Committee. He receives lavish compensation, including $80,000 in 2016. Moreover, Defendant Murley's large Company stock holding, worth approximately $422,765 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. His insider sale before the fraud was exposed, which yielded approximately $158,210 in proceeds, demonstrates his motive in facilitating and participating in the fraud. As a trusted Company director, and member of the Audit Committee, Defendant Murley conducted little, if any, oversight of the Company's engagement in the Regulatory Misconduct and Sales Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets.

Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed both the 2016 10-K and the 2017 Registration Statement. For these reasons, too, Defendant Murley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218.    Additional reasons that demand on Defendant Barkett is futile follow. Defendant Barkett has served as a Company director since 2013 and is a member of the Audit Committee. He receives lavish compensation, including $93,000 in 2016. Moreover, Defendant Barkett's large Company stock holding, worth approximately $274,715 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director and member of the Audit Committee, Defendant Barkett conducted little, if any, oversight of the Company's engagement in the Regulatory Misconduct and Sales Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2017 Registration Statement. For these reasons, too, Defendant Barkett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219.    Additional reasons that demand on Defendant Avery is futile follow. Defendant Avery has served as a Company director since 2013. He receives lavish compensation, including $79,500 in 2016. Moreover, Defendant Avery's large Company stock holding, worth approximately $340,844 before the fraud was exposed, reveals his interest in keeping the

Company's stock price as high as possible. As a trusted Company director, Defendant Avery conducted little, if any, oversight of the Company's engagement in the Regulatory Misconduct and Sales Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2017 Registration Statement. For these reasons, too, Defendant Avery breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220.    Additional reasons that demand on non-party John Fitchthorn ("Fitchthorn") is futile follow. Fitchthorn has served as a Company director since December 2017. Fitchthorn was appointed to the board in connection with a standstill agreement between the Company and Cannell Capital LLC ("Cannell"). Cannell beneficially owned 8% of the Company's outstanding Class A shares as of the time of Fitchthorn's appointment. One of the terms of the standstill agreement is that Cannell or any affiliates will vote their shares against any proposals or resolutions to remove any member of the board. Further, Cannell agreed not to engage in shareholder activism against the Company. These provisions evidence a desire by Cannell, and, by extension, Fitchthorn, to maintain the status quo at HIIQ and not take actions adverse to the interests of the remaining board members. As the other board members face a substantial likelihood of liability in the instant action, Fitchthorn is unable to evaluate a demand with independence. For these reasons, too, Fitchthorn is not independent, and thus demand upon him is futile and, therefore, excused.

221.    Additional reasons that demand on the Board is futile follow.

222.     As described above, three of the Directors on the Board directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct and Executive Code of Ethics. Defendants Kosloske, Wang and Murley received proceeds of nearly $42.9 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

223.     Demand in this case is excused because the Directors, seven of whom are named as defendants in this action, and two of whom are defendants in the Securities Class Action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

224.     Defendant Kosloske is the sole member and primary manager of Health Plan Intermediaries, which is the sole managing member of HPIS and has sole voting and dispositive power over shares held by HPIS. As a result, Defendant Kosloske beneficially owns 3,841,667 shares of HIIQ's Class B stock. Per 2017 Proxy Statement "shares of Class B common stock, together with the Series B Membership Interests of Health Plan Intermediaries Holdings, LLC, our operating subsidiary, are exchangeable, at Defendant Kosloske's election, for equal number of shares of Class A common stock." If he executed such an exchange, Defendant Kosloske would control approximately 49.3% of the Company's then-outstanding Class A common stock, providing him with power to control the remaining directors' positions on the board. Thus, the

remaining directors are beholden to Defendant Kosloske. As Defendant Kosloske faces a substantial likelihood of liability in the Securities Class Action, the remaining directors are unable to evaluate a demand with independence because of Defendant Kosloske's ability to control the board. Thus, demand is futile and, therefore, excused.

225.    Director-Defendants Barkett and Avery are both involved with The Friedreich's Ataxia Research Alliance, where Defendant Barkett is a committee member and Defendant Avery is Chairman of the board. As both face a substantial likelihood of liability in this action, and both are beholden to one another by their positions at The Friedreich's Ataxia Research Alliance, neither can evaluate a demand with independence or disinterest, and therefore, demand is excused.

226.    Additionally, each one of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $20,000 for its own common stock during the period in which the false and misleading statements were made. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company, and yet they approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

227.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the scheme to make, and to fail to correct, materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy

of Company records and reports, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

228.    HIIQ has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Director-Defendants or others who were responsible for that wrongful conduct to attempt to recover for HIIQ any part of the damages HIIQ suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

229.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

230.    The acts complained of herein constitute violations of fiduciary duties owed by HIIQ's officers and directors, and these acts are incapable of ratification.

231.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of HIIQ. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that

eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of HIIQ, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

232.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause HIIQ to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

233.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Individual Defendants for Violations of
Section 14(a) of the Exchange Act**

234.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

235.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of,

or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

236.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

237.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

238.     Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that the Company: (1) engaged in the Regulatory Misconduct and Sales Misconduct; and (2) had not maintained adequate internal controls.

239.     The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the Regulatory Misconduct and Sales Misconduct and the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

67

240.    The 2017 Proxy Statement also made reference to the Company's Code of Business Conduct and Ethics. The Code required the Company and Individual Defendants to abide by relevant laws and statutes, make accurate and non-misleading public disclosures, deal fairly with the public, and not engage in insider trading. By engaging in the Regulatory Misconduct and Sales Misconduct, issuing false and misleading statements to the investing public, and insider trading, the Individual Defendants violated the Code of Conduct. The 2017 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Business Conduct and Ethics were being violated.

241.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

242.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

## **SECOND CLAIM**

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

243.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding HIIQ. Not only is HIIQ now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also

a victim of the unlawful scheme perpetrated upon HIIQ by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of dollars of its own shares on the open market at artificially-inflated prices, damaging HIIQ.

245.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

246.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about HIIQ not misleading.

247.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by HIIQ. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from

them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

248.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and/or signed the Company's Form 10-Ks and 10-Qs filed with the SEC during the Relevant Period.

249.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

250.    Plaintiff on behalf of HIIQ has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

251.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

252.    The Individual Defendants, by virtue of their positions with HIIQ and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of HIIQ within the meaning of §20 (a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause HIIQ to engage in the illegal conduct and practices complained of herein.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

253.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of HIIQ's business and affairs.

255.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

256.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of HIIQ.

257.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

258.    In further breach of their fiduciary duties owed to HIIQ, the Individual Defendants willfully or recklessly caused the Company to engage in the Regulatory Misconduct and Sales Misconduct.

259.    Also in breach of their fiduciary duties owed to HIIQ, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's TPA Application with the FLOIR was unsuccessful as a result of, *inter alia*, the agency's discovery of undisclosed legal actions against HIIQ insiders; (2) the Company was omitting material information from the FLOIR and disregarding the FLOIR's instructions in completing the TPA Application; (3) the Company privately warned the FLOIR of the anticipated "domino effect" of the FLOIR's denial, by which the Company would subsequently either lose or be denied licenses in other states; (4) the TPA license denial was substantially harming the Company's ability to conduct its core business operations; (5) the Company had been accused of fraud by insurance

regulators in Montana, and had suffered negative regulatory actions there as a result of the Company's misconduct; (6) the Company engaged in the Regulatory Misconduct and Sales Misconduct; (7) the Company failed to maintain internal controls; and (8) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact.

260.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

261.    In breach of their fiduciary duties, four of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing nearly $185,000 worth of Company stock at artificially inflated prices.

262.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed

knowingly or recklessly and, *inter alia*, for the purpose and effect of artificially inflating the price of HIIQ's securities and engaging in insider sales.

263.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and, *inter alia*, for the purpose and effect of artificially inflating the price of HIIQ's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

264.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

265.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, HIIQ has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

266.    Plaintiff on behalf of HIIQ has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

267.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, HIIQ.

269.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from HIIQ that was tied to the performance or artificially inflated valuation of HIIQ, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

270.    Plaintiff, as a shareholder and a representative of HIIQ, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

271.    Plaintiff on behalf of HIIQ has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

272.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

273.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence HIIQ, for which they are legally responsible.

274.    As a direct and proximate result of the Individual Defendants' abuse of control, HIIQ has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, HIIQ has

sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

275.    Plaintiff on behalf of HIIQ has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

276.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

277.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of HIIQ in a manner consistent with the operations of a publicly-held corporation.

278.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, HIIQ has sustained and will continue to sustain significant damages.

279.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

280.    Plaintiff, on behalf of HIIQ, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

281.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

282.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal

investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

283.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

284.    Plaintiff on behalf of HIIQ has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of HIIQ, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to HIIQ;

(c)    Determining and awarding to HIIQ the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing HIIQ and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect HIIQ and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

76

2.  a provision to permit the shareholders of HIIQ to nominate at least four candidates for election to the board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding HIIQ restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: April 5, 2018                        Respectfully submitted,

Of Counsel:                                 **FARNAN LLP**

**THE BROWN LAW FIRM, P.C.**                /s/ Brian E. Farnan
Timothy W. Brown                            Brian E. Farnan (Bar No. 4089)
240 Townsend Square                         Michael J. Farnan (Bar No. 5165)
Oyster Bay, NY 11771                        919 N. Market St., 12th Floor
Telephone: (516) 922-5427                   Wilmington, DE 19801
Facsimile: (516) 344-6204                   Telephone: (302) 777-0300
Email: tbrown@thebrownlawfirm.net           Facsimile: (302) 777-0301
                                            bfarnan@farnanlaw.com
                                            mfarnan@farnanlaw.com

                                            *Attorneys for Plaintiff*